UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Bethany S. Carroll, | ) | Civil Action No. 5:21-1035-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act").

Having carefully considered the parties' submissions and the applicable law, the court affirms the

Commissioner's decision for the reasons discussed herein.

I.    Relevant Background

A.    Procedural History

In October 2018, Plaintiff filed for DIB alleging she became disabled on October 8, 2017.

Tr. 172-73. After being denied initially, Tr. 82, and upon reconsideration, Tr. 101, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 118-19. After a January 22,

2020 hearing at which Plaintiff was represented by counsel, *see* Tr. 38-66, ALJ Jerry W. Peace

issued an unfavorable decision denying Plaintiff's claim in a February 7, 2020 decision, Tr. 21-

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Kilolo Kijakazi for Andrew Saul as Defendant in this action.

33. On February 3, 2021, the Appeals Council denied Plaintiff's request for review, making the ALJ's February 7, 2020 decision the Commissioner's final decision for purposes of judicial review. Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed April 7, 2021. ECF No. 1.

B.     Plaintiff's Background

Born April 24, 1981, Plaintiff was 36 years old at the time of her alleged onset date of October 8, 2017, and 38 years old at the time of her hearing. Tr. 45, 172. In her October 2018 Disability Report-Adult form, Plaintiff indicated she graduated from high school in 1998. Tr. 189. She did not attend special education classes and did not complete specialized training. Tr. 189. Plaintiff indicated that in the 15 years prior to her becoming unable to work she had worked as a care team coordinator, medical receptionist, optometrist technician, personal care assistant, and a receptionist in the HVAC business. Tr. 189. Plaintiff indicated she stopped working on October 8, 2017 because of her conditions, which she listed as: generalized anxiety, panic disorder, post traumatic stress disorder, major depressive disorder, obsessive compulsive disorder, social anxiety, cardiac arrhythmia/atrial tachycardia, joint/muscle pain, polycystic ovary syndrome, and obesity (due to anxiety issues and medications). Tr. 188. Plaintiff indicated she was 5'5" tall, weighed 260 pounds, and her conditions caused her pain or other symptoms. Tr. 188.

In a Disability Report-Appeal dated March 15, 2019, Plaintiff indicated there had been no changes to her previously reported conditions. Tr. 210. In a Disability Report-Appeal dated June 17, 2019, Plaintiff indicated her condition had changed: as of approximately May 2019 her depression and anxiety had worsened. She was also having more frequent headaches. Tr. 234. Plaintiff further reported that as of April 2019 she had the new condition of "bipolar." Tr. 234.

2

C.    Administrative Proceedings

On January 22, 2020, Plaintiff appeared with counsel at an administrative hearing and testified regarding her application for DIB. Tr. 39. Vocational Expert ("VE") Kristin Panella also appeared at the hearing. Tr. 39. Counsel for Plaintiff had no objection to the exhibits in the record. The ALJ received all exhibits into evidence and declared the record closed. Tr. 41.

1.    Plaintiff's Testimony

In response to questions from the ALJ Plaintiff testified she lived in a house with her husband and 16-year-old son. Tr. 44. She confirmed her date of birth and said she was 38 years old. Tr. 44-45. Plaintiff indicated she was 5'5" tall and weighed 266 pounds; she said she considered her normal weight to be around 160 or 170 pounds but noted she had gained weight over the past couple of years. Tr. 45. Plaintiff said she had graduated from high school but had no further schooling or training. Tr. 45-46. Plaintiff noted she could read, write, add, and subtract. Tr. 45-46. Plaintiff said she was right-handed. She said she had a driver's license and could drive but her husband had driven her to the hearing. Tr. 46. Plaintiff testified she had collected unemployment in the past, although she could not recall when she last received it. Tr. 46-47.

Plaintiff testified she was no longer working. She said her last job had been with Carolina Eye Care; her duties included scheduling and taking patients back to rooms and starting their eye exams. Tr. 47. Plaintiff said she had also worked with Innervision and did mainly scheduling there. Tr. 47. Plaintiff said that job primarily involved handling paperwork. Tr. 48. Plaintiff said her job with Gentiva/Kindred involved payroll, scheduling, filing, and talking to the clinicians "back and forth between the clinicians and the patients." Tr. 48.

Plaintiff said she had left her last job with Carolina Eye Care because of her panic. Tr. 49. She said she did not work there but a few days and that she could not keep up with the job. She

could not grasp it and could not remember. Tr. 49. Plaintiff said she had a few interviews with the hospital around that time but was told she did not interview well. Tr. 49.

When asked what the medical reasons she thought she could not work were, Plaintiff said, "My anxiety and nervous; I get extremely nervous. My panic disorder, which will cause me to have to like leave my, leave my job. You know, I have to walk away. I get, I get sweaty, shaky, my legs will get numb, and forgetful . . . I get confused." Tr. 49. The ALJ asked Plaintiff whether she had any physical issues that impacted her ability to sit, stand, and walk. Plaintiff said there was nothing bad, but she noted her back and leg hurt. Tr. 49. She noted she was taking ibuprofen for her back. Tr. 50. Plaintiff confirmed it was primarily her anxiety and panic attacks that impacted her. Tr. 50.

Plaintiff said her family had a dog, a cat, and a fish. She said her son was the main caregiver for the pets. Tr. 50. Plaintiff said she was able to cook and did cook; she said she did not cook a lot of big meals. Tr. 50. Plaintiff said she could shower and get dressed on her own. Tr. 50-51. Plaintiff said her husband did the yard work; however, she did not think anything would prevent her from doing it. Tr. 51. She said she could do laundry. Tr. 51. She said she did some house-cleaning, although her husband and son also helped with it. Tr. 51. Plaintiff said she would be capable of doing the cleaning on her own. Tr. 51. Plaintiff said she could shop, but not on her own. Tr. 51. Plaintiff said her last trip for pleasure had been a day trip to Gatlinburg to look at Christmas lights. Tr. 52. Plaintiff said she had little family left for family socializing; she said she may get together with some family on Thanksgiving or Christmas. Tr. 52. Plaintiff said she no longer got together with friends to socialize. Tr. 52. She said she had a cell phone and a Facebook account. Tr. 52. Plaintiff said she did not go to church and she very rarely would go out to eat. Tr. 52-53.

4

Plaintiff said she continued to see a doctor for her panic attacks and the medications she was taking were effective "to an extent," although they made her very drowsy. Tr. 53. She said drowsiness and weight gain were the main side effects. She noted that, even taking medications, she still has panic at times. Tr. 53. Plaintiff said she may have one drink once or twice a year; she does not use street drugs. Tr. 53.

Plaintiff described her typical day as taking her son to school, then coming home and trying to read or watch television. Tr. 53-54. Plaintiff said she also sleeps some during the day, noting she has insomnia and a "messed up" sleep schedule. Tr. 54.

The ALJ turned the questioning over to Plaintiff's counsel. Counsel noted Plaintiff's testimony about her abilities to do things at home and asked why she believed she would not be successful in a job. Tr. 54. Plaintiff said it was because she has a difficult time staying focused and concentrating. Tr. 54. Plaintiff noted that at home she sometimes loses concentration doing dishes or laundry. Tr. 54-55.

Plaintiff said her job at Gentiva had ended because "they did not want [her] there anymore." Tr. 55. Plaintiff noted that, in 2015 or 2016, she had been out on leave for six weeks for severe panic disorder; she was "in the bed for like two, two weeks straight" and lost 14 pounds. Tr. 55-56. Plaintiff said when she returned remarks were made about her being slow and about how she had "been out on [her] leave due to [her] body." Tr. 55. Plaintiff said the 2017 management change there was not "as accommodating." Tr. 56. Plaintiff noted she had called out [of work] some; she also noted there were "numerous" times she had to have her husband come and get her from her job in the middle of the day because of panic. Tr. 56.

Plaintiff noted that, in 2017, she had a couple of panic attacks in the grocery store so she no longer went there alone. Tr. 56-57. Plaintiff said she did not know what caused the attacks in

the grocery store, that they would "come[] outta nowhere." Tr. 57. Plaintiff also noted she went to urgent care with heart palpitations. She believed she was having a panic attack; however, the urgent care personnel believed she could be having a heart attack and sent her by ambulance to the hospital. Tr. 58. It turned out to be panic. She says she has seen a cardiologist since 2011 because of heart palpitations. Tr. 58-59. Plaintiff said the palpitations had worsened. The doctor tried to fix it with an ablation, but that did not work. She and the doctors still attribute the problem to anxiety. Tr. 59.

Plaintiff testified that, even with treatment and medication, she still has panic attacks "at least several times a week." Tr. 59. She said she would "throw a number out, guessing 30 . . . or more." Tr. 59. Plaintiff said the panic attacks themselves did not last "as long" but the attacks would affect her for "hours afterwards." Tr. 59. She said she would feel tired, exhausted, and drained after an attack; she said she would "just want to sleep[.]" Tr. 59-60. Plaintiff said she also had episodes of depression that also made her want to sleep. Tr. 60. She said when she was depressed she would stay to herself and sleep. Tr. 60. Plaintiff said that on such days she would not get up, get dressed, do laundry, or make meals. Tr. 60. Plaintiff estimated she had days like that about "four or five" days out of the week. Tr. 60. Plaintiff described a "good day" as one when her husband is off of work and they are able to get out of the house. Plaintiff said she did not go anywhere alone. Tr. 61.

2. VE's Testimony

VE Panella identified Plaintiff's past relevant work ("PRW") as that of medical secretary, Dictionary of Occupational Titles ("DOT") 201.362-014, specific vocational preparation ("SVP") 6; skilled; sedentary exertion level; and optometric assistant, DOT 079.364-014, SVP 6, sedentary

exertion level; skilled. Tr. 62-63. The ALJ noted he found both of these to be PRW for Plaintiff. Tr. 63.

The ALJ asked the VE to assume a hypothetical individual who has no exertional limitations but is limited as follows:

> [This individual's] work would be limited to simple, routine and repetitive tasks performed in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any workplace changes; who is capable of learning simple vocational tasks and completing them at an adequate pace with persistence in a vocational setting. The individual can perform simple tasks for two-hour blocks of time with normal rest breaks during an eight-hour workday. He has only occasional interaction with the public and only occasional interaction with coworkers.

Tr. 63. The ALJ asked if the hypothetical individual could perform any of Plaintiff's past work as she performed it or as it customarily was performed. The VE responded in the negative. Tr. 63. The ALJ asked whether there would be any other jobs available to an individual of Plaintiff's age, education, work experience, and skill-set who had those limitations. Tr. 63. The VE indicated there would be available jobs. Tr. 63. The VE offered the first example as that of a laundry worker, DOT number 361.685-018, unskilled, with an SVP of 2 and at a medium exertional level. She testified there were approximately 445,000 jobs in the national economy. Tr. 63. The VE offered the next example as that of an inspector and hand packager, DOT number 559.687-074, unskilled, light exertion, SVP of 2. There are 315,000 jobs in the national economy. Tr. 63-64. The VE offered a final example as that of ticket taker, DOT number 209.587-034, unskilled, SVP of 2, light exertion. There are approximately 250,000 jobs in the national economy. Tr. 64.

The ALJ then asked the VE what the impact would be if, in addition to these limitations, because of severe panic attacks the individual would be off-task 20 percent or more of the workday and absent from work three days or more from work. Tr. 64. The VE opined that such a limitation would be work-preclusive. Tr. 64.

The ALJ asked the VE to review her responses to the hypotheticals and to compare the occupations' DOT requirements with the limitations in the hypotheticals to determine whether there existed any "conflicts apparent or otherwise" between them. Tr. 64. The VE responded that there were no conflicts. Tr. 64. She noted, however, that the mental limitations are supported by her professional education, training, and experience. Tr. 64. The VE described those mental limitations as the production pace of the work, decision-making and changes, and the interaction with the individual, off-task behavior, and absenteeism. Tr. 64-65.

Plaintiff's counsel then asked the VE whether the responses to the ALJ's second hypothetical would change if the combination of off-task and absenteeism were separated. The VE responded that each of these limitations—off-task and absenteeism—would separately be work-preclusive. Tr. 65.

After a brief closing statement by Plaintiff's counsel, the hearing was closed. Tr. 65-66.

## II.    Discussion

### A.    The ALJ's Findings

In his February 7, 2020 decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since October 8, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: depression, anxiety and panic attacks (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Work is limited to simple, routine and repetitive tasks, performed in a work environment free of fast-paced production requirements, involving only simple, work-related decisions, and with few, if any, work place changes. She is capable of learning simple vocational tasks and completing them at an adequate pace with persistence in a vocational setting. She can perform simple tasks for two-hour blocks of time with normal rest breaks during an eight-hour workday, with only occasional interaction with the public and coworkers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 24, 1981 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

Tr. 22-23, 25, 31-32.

B.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

inability to engage in any substantial gainful activity by reason of any medically

9

determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the listed impairments, found at 20 C.F.R. Part 404, Subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146, n.5 (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157-58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d

846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 428 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.     Analysis

Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because (1) the ALJ failed to properly evaluate the opinion evidence, particularly the opinion of Dana Wiley, M.D., without providing legally sufficient reasoning; and (2) the ALJ failed to properly assess the functional limitations of Plaintiff's panic attacks with heart palpitations. Pl. Br. 1, ECF No. 13. The Commissioner argues that substantial evidence supports the ALJ's decision. Def. Br., ECF No. 15.

A.  The ALJ's treatment of opinion testimony

For benefits applications filed on or after March 27, 2017 (such as Plaintiff's), the SSA has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See*

Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017). Under the new regulations, ALJs need not assign an evidentiary weight to medical opinions or give special deference to treating source opinions. 20 C.F.R. § 404.1520c(a) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[3] Instead, ALJs consider medical opinions using five factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) the medical source's specialization; and (5) other factors, such as the medical source's familiarity with the other evidence in the claim or understanding of the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). The first two factors, supportability and consistency, are the most important in determining the persuasiveness of a medical source's opinion, and the ALJ is not required to explain the consideration of the other three factors. *Id.* § 404.1520c(b)(2). The new regulations further deem certain evidence "inherently neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c). This includes statements on issues reserved to the Commissioner such as whether a claimant is disabled, is unable to work, or is incapable of doing past relevant work. 20 C.F.R. § 404.1520b(c)(3).

---

[3] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental, or other demands of work activity or to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 416.913(a)(5).

1. Medical evidence

Plaintiff's first allegation of error focuses on opinion evidence, particularly that of treating provider Dr. Wiley, arguing the ALJ's consideration of his opinion was in error. Plaintiff also submits the ALJ improperly evaluated and considered the opinions of the state agency medical consultants. The Commissioner disagrees. To consider Plaintiff's allegation of error as to the ALJ's evaluation and consideration of the mental-health opinion evidence the court first sets out those opinions and relevant related information.

2. Evidence from before Plaintiff's alleged onset date of October 8, 2017

The court briefly summarizes potentially relevant[4] record evidence from before October 8, 2017.

- James Page, M.D., Psychiatric Associates:  Plaintiff began seeing Dr. Page in May 2015 with a complaint of "anxiety progressive with panic disorder." Tr. 299.[5] Plaintiff indicated she was "terrified to drive" and had panicked at work. Tr. 300. On examination Plaintiff was alert and oriented with good eye control and reality contact. Tr. 301. Dr. Page noted Plaintiff was not suicidal but had feelings of helplessness and worthlessness; she was moderately depressed with "lack[ed] ability to function at home and work." Tr. 301. He diagnosed a panic disorder, prescribed Zoloft, Xanax, and counseling. Tr. 301. Dr. Page noted in June 2015 that Plaintiff was driving some but had to make herself do so. Tr. 302. On July 2, 2015, Dr. Page noted Plaintiff seemed "better" and had not had any "real bad panic attacks." Tr. 302. She indicated she would not drive on Interstate 85. Tr. 302. Plaintiff returned to Dr. Page on August 20, 2015 and reported she had had no panic attacks. Tr.

---

[4] Focus is on Plaintiff's treatment of psychiatric symptoms and any physical symptoms related to her psychiatric health.

[5] Dr. Page's handwritten records are difficult to decipher.

302. In October 2015 Plaintiff reported she had had palpitations and tightness in her chest; she said she still would not drive on I-85. Tr. 302. On December 3, 2015 Plaintiff reported continuing palpitations but "no big panic attacks." Tr. 302. On February 25, 2016, Plaintiff was "OK." Tr. 303. Her medication was changed after she reported an episode of "sweating, palpitations, altered mental state, tired and drained with yawning afterward." Tr. 303. In July 2016 Plaintiff indicated she had been on antibiotics and had experienced three panic attacks such that she had to pull over the car and have her husband go and get her. Tr. 303. Dr. Page retired on July 31, 2016. Tr. 304.

- <u>Lynne Morrow, M.D., Upstate Psychiatry</u>: In September of 2016 Plaintiff began seeing Dr. Morrow and noted she had panic attacks, some of which were full blown, but she was unsure why. She also noted social anxiety. Tr. 306. On mental status examination Dr. Morrow noted mood and affect were anxious, insight was fair, thought processes were clear, and speech was rapid secondary to anxiety. Tr. 308. In December of 2016 Plaintiff was noted to have continued panic attacks and limited insight. Tr. 309. In January of 2017 Plaintiff denied full blown panic attacks but reported many panic attacks daily with chest pain. Tr. 310. Her medication was changed. Tr. 310. In May of 2017, Plaintiff noted she was feeling overwhelmed at work. Tr. 311. Plaintiff referenced suicidal thoughts but no plan. Tr. 311.

3. Evidence from October 8, 2017 and beyond

Plaintiff returned to Dr. Morrow at Upstate Psychiatry on November 9, 2017. Tr. 312. Plaintiff indicated she had been "bad" since her last visit. Tr. 312. Plaintiff indicated she had not come back because she was afraid to take the prescribed medications. Tr. 312.[6] Plaintiff reported

---

[6] 2019 records from treating psychiatrist Dr. Wiley do not indicate any fear of taking medications.

she had been to the ER the previous Tuesday because of dizziness and heart palpitations. Tr. 312. Plaintiff was noted to be uncooperative and anxious; she was noted to be "quite suspicious" of her doctor. Tr. 312. Dr. Morrow indicated Plaintiff had a poor therapeutic alliance with her and had not complied with her treatment plan. Tr. 312. Dr. Morrow indicated a further treatment relationship would not be beneficial. Tr. 312.

On November 13, 2017, Plaintiff saw her cardiologist, Barbara Moran-Faille, M.D., for follow up concerning heart palpitations. Tr. 378-79. Notes indicate the follow-up was at the request of the ER. Tr. 379. Plaintiff had a "[l]ong history thereof with multiple evaluations without any significant abnormality." Tr. 379. Dr. Moran-Faille noted Plaintiff "went to MD 360 and to St Francis ER the following day, elevated white count with normal EKG, CXR and other labs, noted to have pressured speech and to be exhibiting hypervigilant/anxious behavior in the ER." Tr. 379. Dr. Moran-Faille noted Plaintiff was pleasant but appeared with pressured speech and "multiple somatic complaints to include congestion/sinus pressure, dizziness/room spinning consistent with vertigo, anxiety worse, palpitations, fatigue, numbness left index finger pain left brachial area all occurring randomly." Tr. 379. Dr. Moran-Faille had a "very frank discussion about anxiety as the driver of many of [Plaintiff's] issues." Tr. 382. Plaintiff was to take a beta-blocker and to address anxiety, which is the underlying issue. Tr. 382. Plaintiff was further advised to engage in moderate physical activity. Tr. 382. It was noted that Plaintiff had scheduled an appointment with a new psychiatrist, Dr. Wiley. Tr. 379, 382.[7]

Plaintiff returned to Dr. Moran-Faille in September 2018 and requested a yearly check-up.

---

Rather, Dr. Wiley prescribed several medications to Plaintiff, discontinuing one because of a poor response. Tr. 986-87.

[7] Although reference is made to Dr. Wiley's treating Plaintiff before 2019, the only provided records of visits with her are from July and October 2019. Tr. 984-90. Dr. Wiley also completed a Medical Assessment Mental Ability-Work Related Activities on July 22, 2019. Tr. 969-72.

Tr. 390. She indicated her anxiety remained severe and she still did not drive because of it. Tr. 390. Plaintiff indicated she was seeing Dr. Wiley for symptoms of anxiety. Tr. 390. Plaintiff was reminded her symptoms were entirely driven by anxiety. Tr. 393.

The record includes notes of Plaintiff's July and October 2019 visits to Dr. Wiley. On July 15, 2019, Plaintiff saw Dr. Wiley and noted she was applying for disability but had been denied. Tr. 986. Plaintiff complained of poor sleep and recurrent anxiety with feelings of dread. Plaintiff had not had acute psychosis or suicidal/homicidal ideations. Her mood was "less depressed, affect still anxious." Tr. 986. Dr. Wiley checked boxes indicating Plaintiff was anxious with good insight. Her prognosis was fair and may improve. Dr. Wiley checked a box indicating Plaintiff was "unable to work." Tr. 986. Dr. Wiley listed several medications (including Doxepin, Lexapro, Xanax, and Rexulte), which he apparently prescribed for Plaintiff. Tr. 986.

Plaintiff returned to Dr. Wiley on October 10, 2019. Tr. 987. Her mood was less depressed and her affect less anxious. Tr. 987. Dr. Wiley noted poor response to Doxepin, which was discontinued. Tr. 987. Other medications were continued. Tr. 987. Dr. Wiley checked boxes indicating Plaintiff's concentration was good, her affect appropriate, her insight fair, and her concentration good. Tr. 987. Dr. Wiley again indicated a "fair" prognosis. As to functioning, Dr. Wiley checked boxes indicating minimal change was expected and the question of whether she was able to work was "N/A." Tr. 987.

4. Opinions

1. Consultative examiner Rebecca Sorrow, PhD

On February 6, 2019, Plaintiff was examined by consultative examiner Rebecca Sorrow, PhD, at the request of the Commissioner. Tr. 777. Plaintiff was driven to the appointment by her husband. Tr. 777. She was cooperative and had clear, unpressured speech. Tr. 777. Dr. Sorrow

reviewed Plaintiff's records and noted her problems included irregular heartbeat and anxiety. Tr. 777. Dr. Sorrow noted that Upstate Psychiatry had last seen Plaintiff in November 2017 and she had been discharged for failure to follow recommendations. Tr. 777. Plaintiff indicated she had been seeing Dr. Wiley for the past year about once per month. Tr. 778. She indicated she was taking Lexapro, Xanax, and Ambien. Tr. 778. Plaintiff noted she had been working part time for Carolina Home Health, but when she was asked to go to full time she quit in "May 2017 or 2018." Tr. 778. On examination, Plaintiff was oriented to place, time, person, and situation. Tr. 778. Her speech was logical. She scored 28/30 on the Folstein Mini-Mental State Examination ("MMSE"). Tr. 778. She missed two of the serial sevens; she knew her social security number and the current President. Tr. 778. Plaintiff's affect was nervous and tearful. Her self-described mood was "kind of flat." Tr. 778. Plaintiff said she was sometimes happy but sometimes felt depressed and inadequate. Tr. 778. Plaintiff indicated she had "always had problems with anxiety and that she has panic attacks several times a week even with medication." Tr. 778. She described her memory as bad and indicated she had problems with concentration and attention. Tr. 778. Plaintiff denied hallucinations; she showed no indication of psychosis or delusional thinking. Tr. 778. Plaintiff denied current or past suicidal ideation. Tr. 778. She denied any self-injurious behavior and homicidal ideation. Tr. 778. Plaintiff said she thought her judgment was bad and she had to ask for advice on even small matters. Tr. 779. She said she worried about "bills, death, dying, losing family, her son being an only child, her husband working, and her health." Tr. 779. Plaintiff did not seem to exaggerate or malinger. Tr. 779. Dr. Sorrow diagnosed Plaintiff with persistent depressive disorder, generalized anxiety disorder, and panic disorder. Tr. 779. Dr. Sorrow noted Plaintiff's report of depression symptoms, anxiety, and frequent panic attacks. Tr. 779. Plaintiff advised Dr. Sorrow the following about her activities of daily living ("ADLs"): she and her

husband share housekeeping and cooking duties; her husband does the grocery shopping, as she says she does not enter grocery stores; she can drive but only goes short distances and not alone; she uses a cell phone and computer, accessing the internet and social media; she makes her own appointments and manages her finances; she is capable of handling her own hygiene, which she describes as doing only "the basics." Tr. 779. Dr. Sorrow noted Plaintiff was able to "relate fairly well during the evaluation. Communication skills are good and she was cooperative and polite." Tr. 780. As to concentration, persistence, and pace, Dr. Carroll opined Plaintiff was functioning in the average range of intellectual functioning, noting her 28/30 MMSE score and her behavior. Tr. 779. Dr. Sorrow opined Plaintiff "is probably capable of the concentration and focus needed to perform simple tasks and follow basic instructions." Tr. 780. She noted Plaintiff's depression, anxiety, and panic attacks may adversely affect her ability to perform more complex tasks, follow complicated instructions, or adapt to change. It was noted Plaintiff did not interact well with the public. Tr. 780.

2. State agency psychology consultants

On February 21, 2019, state agency psychological consultant Silvie Ward, Ph.D., reviewed Plaintiff's medical file and completed a Disability Determination Explanation opinion. Tr. 67-79. Dr. Ward found Plaintiff had the impairment of anxiety and obsessive-compulsive disorders as well as obesity. Tr. 71. She opined Plaintiff did not meet a listed impairment, finding she had moderate limitations in her ability to interact with others; and concentrate, persist, or maintain pace. Tr. 71. Dr. Ward found Plaintiff had no limitations in her ability to understand, remember, or apply information; and mild limitations in her ability to adapt or manage oneself. Tr. 71. Dr. Ward opined that Plaintiff's symptoms were severe but would not preclude the performance of simple, repetitive work tasks in a setting that does not require on-going interaction with the public.

Tr. 76-77.

On May 16, 2019, state agency psychiatric consultant Marvin Blase, M.D. reviewed Plaintiff's medical file and offered his opinion at the reconsideration level. Tr. 83-100. Dr. Blase found Plaintiff had moderate limitations in her ability to concentrate, persist, or maintain pace; ability to interact with others; and her ability to adapt or manage oneself. Tr. 90. He also found that she had a mild limitation in her ability to understand, remember, or apply information. Tr. 90. Dr. Blase opined Plaintiff would be able to understand and remember both detailed and simple instructions; she would be able to perform simple, unskilled tasks and maintain concentration for at least two-hour periods. She would function most effectively in a more low-demand/non-quota work environment. She could respond appropriately to supervision and coworkers but would perform best in settings that did not require ongoing public-interaction. He found Plaintiff would be aware of normal hazards, use judgment to make simple work-related decisions, and respond appropriately to changes in work routine. Tr. 97.

3. Treating psychiatrist Dana Wiley, M.D.

On July 22, 2019, Dr. Wiley completed a Mental Capacity Assessment form. Tr. 970-73. Dr. Wiley noted Plaintiff's diagnosis as "major depression, recurrent type." Tr. 970. Dr. Wiley checked boxes indicating Plaintiff had marked limitations in her abilities to sequence multi-step activities; initiate and perform a tasks the patient knows how to do; work at an appropriate and consistent pace, or complete tasks in a timely manner; ignore or avoid distractions while working; wok close to or with others without interrupting or distracting them; sustain an ordinary routine and regular attendance at work; work a full day without needing more than the allotted number or length of rest periods during the day. Tr. 970-71. Dr. Wiley further noted Plaintiff had marked limitations in her abilities to adapt to changes; manage psychologically based symptoms; cooperate

with others, or ask for help when needed; handle conflicts with others; respond to requests, suggestions, criticism, correction and challenges; and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. Tr. 972-73. Dr. Wiley found Plaintiff had moderate limitations in her ability to follow one- or two- step oral instructions; ability to recognize mistakes and solve problems; ability to use reason and judgment in work-related decisions; ability to distinguish between acceptable and unacceptable work performance; ability to maintain personal hygiene and attire in work setting; and her ability to be aware of normal hazards and take appropriate precautions. Tr. 970-72. In explaining his findings Dr. Wiley stated that Plaintiff had "recurrent episodes of depression and anxiety which impair her ability to concentrate and utilize information." Tr. 970. Similarly, he indicated depression, anxiety, and insomnia impaired Plaintiff's ability to "process, retain, and utilize information" and to "interact appropriately or consistently with others." Tr. 971-72.

### 4.    The ALJ's consideration of the opinion evidence

The ALJ considered consultative examiner Dr. Morrow's opinion and found it to be "persuasive as it is supported by a thorough explanation and supported by an in-person evaluation[.]" Tr. 29 (citing opinion and noting Dr. Morrow's examination revealed Plaintiff's "affect was nervous and tearful and [Plaintiff] described her mood as flat, but she was fully oriented, her thought content and processes were normal, she had no compulsive behaviors and she scored a 28/30 on her mini mental status exam, indicative of normal mental functioning"). The ALJ found Dr. Morrow's opinion to be consistent with Plaintiff's conservative mental health treatment and evidence of noncompliance with a provider's recommendations. Tr. 29 (citing Exhibit 6F). Further, the ALJ found the opinion was consistent with Plaintiff's ADLs, including

her ability to do chores, drive, care for herself, prepare meals, and go out to eat occasionally. Tr. 29.

The ALJ then considered Dr. Wiley's July 15, 2019 opinion. Tr. 30. The ALJ noted Dr. Wiley's opinion that Plaintiff was unable to work is on an issue reserved for the Commissioner, making it neither inherently valuable nor persuasive. Tr. 30. The ALJ found Dr. Wiley's opinions regarding Plaintiff's "marked" and "moderate" limitations in various functional areas were not persuasive "as the explanation is vague as to claimant's specific issues supporting such extreme limitations." Tr. 30. Further, the ALJ finds Dr. Wiley's opinions are not supported by her treatment notes indicating Plaintiff had only mild depression a week prior[8] and improved depression and anxiety in October 2019. Tr. 30. Additionally, the ALJ noted Dr. Wiley's opined limitations were not consistent with his objective findings that Plaintiff had an "anxious affect and mildly depressed mood at times but with intact thought process and content, fair to good concentration, and intact memory[.]" Tr. 30. The ALJ further found Dr. Wiley's opinion inconsistent with Plaintiff's conservative treatment regime, which included some evidence of noncompliance and, notably, included Dr. Wiley's October 2019 notation that Plaintiff's condition was improving with medication. Tr. 30. The ALJ also found Dr. Wiley's opinion to be inconsistent with Plaintiff's ADLs, including her ability to care for herself, drive, do household chores, go out to eat, and prepare meals. Tr. 30.

The ALJ also considered the opinions of the state agency experts and found their conclusions that Plaintiff was limited to unskilled work with limited public-interaction to be generally persuasive. Tr. 30. The ALJ noted the opinion was supported by Plaintiff's ongoing anxiety, depression, and panic attacks but also consistent with Plaintiff's generally conservative

---

[8] The "week prior" reference refers to Plaintiff's July 15, 2019 visit with Dr. Wiley. Tr. 984-86.

treatment regime and her improvement on medications. Tr. 30. The ALJ also again noted Plaintiff's mental status exams and her ADLs. Tr. 30. The ALJ imposed greater restrictions as to work with coworkers than the state-agency experts had imposed. Tr. 30. He further found no support for the state-agency experts' imposition of limits to light work with environmental limitations because of Plaintiff's obesity and asthma, noting testing did not indicate she had asthma and further noting her ADLs and her presentation at the hearing. Tr. 30.

        5.  Discussion

    Plaintiff asserts the ALJ failed to give adequate reasons for the weight he assigned to the opinion of Dr. Wiley. Pl. Br. 9-19. In essence, Plaintiff submits the ALJ did not adequately discuss the supportability and the consistency of Dr. Wiley's opinion when compared with the record as a whole. The Commissioner counters that the ALJ followed the guidelines in assessing the opinions, arguing substantial evidence supports his evaluation. Def. Br. 10-14.

    The court agrees with the Commissioner. Here, the ALJ explicitly applied the appropriate regulatory framework noting that he "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c." Tr. 25. The ALJ properly applied the regulation that emphasizes the supportability and consistency factors when assessing the persuasiveness of the medical opinions. *See* 20 C.F.R. § 404.1520c. Moreover, as noted by the ALJ, an adjudicator is not bound to give any specific weight or deference to any medical provider's opinion, including those provided by treating sources. Tr. 29.

    In considering Dr. Wiley's opinion, the ALJ initially considered Dr. Wiley's opinion that Plaintiff "was unable to work." Tr. 30 (citing Exhibit 22F, p. 3—available at Tr. 989). The ALJ appropriately found that "[t]he opinion that [Plaintiff] is disabled is an opinion on an issue that is reserved to the Commissioner. As such, this opinion is neither inherently valuable nor persuasive."

Tr. 30. The ALJ found that Dr. Wiley's remaining findings in his July 15, 2019 opinion were not persuasive because they "are not supported by Dr. Wiley's own treatment notes indicating that [Plaintiff] had only mild depression a week prior and improved depression and anxiety in October 2019." Tr. 30. The ALJ added that "such extreme limitations are inconsistent with [Plaintiff's] conservative treatment regimen, with some evidence of noncompliance, and with the improvement on medications as reflected in Dr. Wiley's October 2019 treatment notes." Tr. 30. The ALJ also explained that "this opinion is inconsistent with [Plaintiff's] daily activities . . . ." Tr. 30.

Plaintiff ascribes error to the ALJ's consideration of Dr. Wiley's opinion, submitting specifically that the ALJ did not adequately consider Dr. Wiley's notes and did not "consider the consistency of Dr. Wiley's opinion with the record as a whole." Pl. Mem. 13. However, the ALJ did as he was required to do under the regulations; he evaluated Dr. Wiley's opinions as a whole, finding they were unsupported by findings in the available records of Dr. Wiley and were inconsistent with the record as a whole, including Plaintiff's generally conservative treatment and her ADLs. Tr. 30.[9] Further, the ALJ's decision includes detailed discussion of how he determined Plaintiff's RFC, including findings on examination that Plaintiff was "calm and cooperative, her behavior was normal, her thought process and content were normal, her memory was intact, her concentration was fair to good, and her insight was fair to good." Tr. 28 (citing Exhibits 8F, 14F, 18F, 22F, 24F). These and other objective medical findings, including her conservative treatment,

---

[9] Plaintiff's ADLs include her ability to drive. Tr. 30. As noted by the ALJ in his decision, Plaintiff's testimony is that she could drive short distances. Tr. 30, *see* Tr. 46 (Plaintiff's hearing testimony). The court notes Plaintiff's argument that Plaintiff "cannot drive." Pl. Mem. 17 (citing portions of record in which Plaintiff indicated she was fearful of driving). Nonetheless, substantial evidence—particularly including Plaintiff's hearing testimony—supports the ALJ's finding that Plaintiff's ADLs include driving. Similarly, the ALJ's findings related to Plaintiff's ability to perform chores and care for herself are supported by substantial evidence. *See* Tr. 51 (hearing testimony).

were found to be "consistent with [Plaintiff's RFC] limitation to simple, routine tasks with no fast-paced production requirements and limited social interactions, as consistent with moderate limitations in social interactions, concentration, persistence and pace and adaptation." Tr. 28. The ALJ had also detailed Dr. Sorrow's consultative findings, including Plaintiff's score of 28/30 on her MMSE, which was "indicative of normal mental functioning[.]" Tr. 27 (citing Exhibit 14F, p. 4). The ALJ also discussed in some detail the records of the two office visits to Dr. Wiley that are available in the record. Tr. 27 (discussing July 15, 2019, and October 10, 2019 visits, found at Exhibits 22F and 23F). Considering the ALJ's detailed decision in full, the court is able to determine that he adequately considered Dr. Wiley's treatment notes and compared Dr. Wiley's opinion and other opinions with the record as a whole.

The ALJ also appropriately found generally persuasive the prior administrative findings of Dr. Ward and Dr. Blase that Plaintiff was not disabled and could perform unskilled work with limited public interaction. Tr. 30 (citing Exhibits 1A, 4A; *see* Tr. 71, 77, 90, 97). The ALJ reasoned that they were "supported by [Plaintiff's] ongoing anxiety and depression with reports of panic attacks but also consistent with [Plaintiff's] conservative treatment regimen and improvement in symptoms on medication." Tr. 30. The ALJ also noted these findings are "consistent with mental status exams" and Plaintiff's daily activities. Tr. 30. However, the ALJ determined that Plaintiff had greater limitations with regard to co-workers "as consistent with her reports of difficulty engaging in social activities." Tr. 30. The ALJ's evaluation of Dr. Ward's and Dr. Blase's prior administrative medical findings adequately considered them as to both the required "supportability" and "consistency" factors. Tr. 30. Substantial evidence supports the ALJ's evaluation of Dr. Ward's and Dr. Blase's prior administrative medical findings.

Although Plaintiff chooses to focus on some evidence that could permit a different conclusion, the issue here is whether the ALJ's decision is supported by substantial evidence, not whether a different conclusion could be supportable. The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). "An ALJ's determination as to the weight to be assigned to a medical opinion will generally not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies,' or has not given good reason for the weight afforded a particular opinion." *Koonce v. Apfel*, 166 F.3d 1209 (4th Cir. 1999) (per curiam) (unpublished) (internal citation & quotation omitted); *see also* 20 C.F.R. § 404.1527(d)(2). In undertaking review of the ALJ's treatment of a claimant's medical sources, the court focuses its review on whether the ALJ's decision is supported by substantial evidence.

The ALJ's analysis comports with the regulations as he properly considered the supportability and the consistency of the opinions of Dr. Wiley, Dr. Ward, and Dr. Blase. The ALJ provided an adequate explanation for why he found the opinions persuasive or unpersuasive, and properly considered them and incorporated them into his RFC to the extent he found them supportive and consistent with the record. Accordingly, the undersigned finds the ALJ's evaluation of the opinion evidence is in keeping with the regulations and is supported by substantial evidence.

B.  The ALJ's consideration of Plaintiff's heart palpitations and anxiety

Plaintiff also challenges the ALJ's consideration of her heart palpitations and anxiety. Plaintiff submits the ALJ improperly discounted her heart palpitations without considering the impact of those palpitations—her panic attacks. Plaintiff submits the ALJ did not adhere to the requirements of 20 C.F.R. 404.1529(c)(3), which requires that the ALJ consider objective medical

evidence as well as other evidence related to symptomology. Pl. Mem. 19-21. The Commissioner counters that the ALJ adequately considered the palpitations and their impact. Def. Mem. 14.

The ALJ discussed medical evidence of Plaintiff's visits to Upstate Cardiology with complaints of heart palpitations. Tr. 26 (referencing Plaintiff's November 13, 2017 and December 8, 2017 visits, referring to Exhibit 8F). The ALJ noted Plaintiff's heart and lung sounds were normal and that she was "counseled regarding her anxiety and advised that this was the cause of her palpitations. She was encouraged to engage in moderate physical activity and to see her psychiatrist." Tr. 26 (citing Exhibit 8F). The ALJ continued his discussion of Plaintiff's medical history—including mental- and physical-health providers—and noted that Plaintiff's shortness of breath and palpitations were associated with her anxiety. Tr. 28. Noting the heart and lung sounds were "normal," the ALJ found the severity of her symptoms—listed above in the same paragraph as being "anxiety, depression and panic attacks"—were not as severe and debilitating as Plaintiff had alleged. Tr. 28. The ALJ noted he had taken her complaints into account based on various limits in her RFC. Tr. 28. He found, though, that she had no exertional limitations, as evidenced by her normal heart and lung sounds, her normal range of motion, and her lack of neurological deficits. Tr. 28.

The ALJ did what he needed to do. He considered Plaintiff's cardiologic history, noted her cardiologist had tied her heart palpitations to her anxiety, and thoroughly discussed Plaintiff's complaints of anxiety and panic attacks in assessing her RFC. Substantial evidence supports the ALJ's consideration of Plaintiff's subjective complaints and the ALJ's RFC assessment.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the

foregoing, the court finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through legal error. *See Craig,* 76 F.3d at 589; *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

August 17, 2022                                    Kaymani D. West
Florence, South Carolina                          United States Magistrate Judge